IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GLOBAL MAINTENANCE, INC.** | : | |
| **d/b/a CENOVA, INC.** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 23-195** |
| | : | |
| **TESSERA** | : | |

**McHugh, J.**                                                                                               **October 23, 2025**

# MEMORANDUM[1]

This is an action for breach of contract in which the parties offered testimony at a three-day bench trial. After considering the record, I find by a preponderance of the evidence that a memorandum of understanding between the parties created an enforceable contract under Pennsylvania law between Defendant Tessera,[2] formerly doing business as Skookum, and Plaintiff Global Maintenance, Inc., which trades under the name Cenova. I also find that Skookum has breached the agreement's literal terms, and the defenses it has advanced do not withstand close scrutiny. Finally, I find that Cenova has proven damages and will therefore enter judgment on its behalf.

### A. The Signed Agreement Between the Parties Constitutes a Contract

Skookum is a facilities management company based in the State of Washington that provides operations and maintenance services to clients with whom it contracts. The Boeing Company is a major global aerospace company which has a large facility in Ridley Park,

---

[1] The discussion of the evidence set forth herein and the analysis of precedent cited by the parties represents the Court's findings of fact and conclusions of law.

[2] Although Skookum's name has changed, because the documents and testimony all refer to Skookum, I will use that name through this memorandum for purposes of clarity.

Delaware County, Pennsylvania.  At the time of the events giving rise to this action, both Skookum and Cenova were providing services to Boeing under direct contracts.  In August 2019, Boeing announced its intention to bundle a variety of services within a single contract and issued a Request for Proposals (RFP).  Skookum undertook to pursue the bundled services contract, contacting Cenova, the incumbent snow removal contractor, to discuss their common interests in continuing to service Boeing, which in turn led to the "Memorandum of Understanding" (MOU) at the center of this dispute.  Notice of Removal, Ex. E, ECF 1-5 at 10-11.

The MOU is a written agreement the parties signed on September 27, 2019.  Skookum seeks to attach legal significance to the document's title, arguing that as a category of document, it cannot represent a contract under Pennsylvania law.  As discussed below, I reject this argument but first review the writing itself to determine whether it sets forth the elements of an enforceable contract under Pennsylvania law.

The introduction states that the MOU is made and entered into "for the purpose of explaining the business relationship between the two parties with respect to [Skookum's bid]."  It goes on to state that in the event Skookum's bid succeeds, Cenova "is committed under a mutually agreeable subcontract to Skookum" to perform work similar to the work detailed in the statement of work/technical documents.  Additionally, the MOU contains a clause requiring modifications to be in writing and executed by both parties to evidence their mutual consent. This suggests that the parties understood the MOU to be an independently existing agreement and that any modifications would conceivably alter its terms therefore requiring mutual pre-approval to protect their respective interests.

Skookum is correct that the MOU refers to a contract to be finalized later, but that does not render the initial agreement meaningless.  *See Dehainaut v. California Univ. of Pa.*, No.

2:10-CV-899, 2011 WL 13176164, at *7-8 (W.D. Pa. July 21, 2011), *aff'd*, 490 F. App'x 420 (3d Cir. 2012); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) ("[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document.") (quoting *Goldman v. McShain*, 247 A.2d 455, 459 (Pa. 1968)). The MOU is both written in the present tense, e.g., "Cenova is committed under a mutually agreeable subcontract to Skookum," and "Skookum commits to contracting Cenova," and at the same time makes explicit future commitments, e.g., "Cenova will honor this pricing," and "Skookum agrees not to provide direct or indirect snow removal . . . without Cenova as the service provider." Just above the parties' signatures, the MOU states that the "parties hereto have executed this agreement," signifying contractual assent rather than simply an intention to agree in the future, as Skookum argues.

Skookum cites three cases from the Commonwealth Court of Pennsylvania in which the court deemed a memorandum of understanding unenforceable. *See Pa. Ass'n of State Mental Hosp. Physicians v. Commw., Pa. Lab. Rels. Bd.*, 557 A.2d 825 (Pa. Commw. Ct. 1989); *Commw. Pa. Liquor Control Bd. v. Clark*, 509 A.2d 928 (Pa. Commw. Ct. 1986); *Shaffer v. Commw. Pa. Liquor Control Bd.*, 500 A.2d 917 (Pa. Commw. Ct. 1985). As an initial observation, these decisions were issued in the context of collective bargaining or the bidding of public contracts, which involve restrictions and formalities that are significantly different than business negotiations between private parties. More importantly, because, as Skookum explicitly recognizes in its trial brief, "it is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties," *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016), it cannot be the case that a document's title has substantive legal import. Rather, the controlling

question is whether the MOU's essential terms are sufficiently clear and defined to be enforced. *See Am. Eagle Outfitters*, 584 F.3d at 585, 587. I conclude that they were.

  The agreement explicitly referred to Skookum's efforts to secure a bundled services contract at Boeing's Ridley Park site, where both parties were already providing services. On the one hand, Cenova agreed to provide proprietary information to Skookum to facilitate its bid and committed to providing the snow removal services under a "mutually agreeable subcontract," and Skookum in turn agreed to use Cenova as the subcontractor if Boeing accepted its bid. Skookum does not appear to argue that there is a lack of consideration, and in any case, such an argument would fail because each party received value from the other. Skookum, a West Coast company with few contacts in this marketplace, received the benefit of Cenova's expertise as the incumbent snow removal contractor, a benefit underscored by the fact that both of Boeing's RFPs explicitly identified Cenova as the snow removal contractor. *See* P-4, Aug. 20, 2019 RFP (stating under "Snow and Ice Removal Plan" that "Cenova, Inc. has been chosen as the contractor to provide all snow and ice removal services for the Philadelphia site" and identifying Cenova under "Contracted Services"); D-7, Sept. 16, 2019 RFP Snow and Ice Removal Plan (same). A confirmed partnership with Cenova would therefore bolster Skookum's bid. Cenova, in return, had the benefit of a promise that it would be awarded the work in return for supporting Skookum in the bidding process. In that regard, it bears mention that the explicit promise in the agreement that Skookum would not "provide direct or indirect" snow removal services without Cenova was incorporated into the agreement at Cenova's insistence.

  For those reasons, I conclude that the MOU is a legally enforceable contract under Pennsylvania law.

### B. Defendant Skookum Breached the Contract

In the MOU, Skookum unambiguously promised not to provide snow removal services at the Boeing facility in Ridley Park, directly or indirectly, without Cenova as the contractor. It is undisputed that Skookum then entered into a bundled services contract with Boeing and provided snow removal services using Sauers Snow and Ice Management to perform that function.

Skookum offers several arguments why its proceeding without Cenova should not be deemed a breach. First, it argues that Boeing selected Sauers as the snow removal contractor. The defense is correct that Boeing reserved the right to approve any subcontractor, P-4, and defense counsel artfully worded his questions to two Boeing witnesses, one presented by way of deposition and one live, to foster an impression that Boeing chose Sauers over Cenova. But the substance of their testimony, and other documentary evidence, does not support a finding that Boeing *chose* Sauers as the snow removal contractor; rather, Boeing approved it. Jaclynn Maguire was a Boeing procurement agent when the bundled services contract was issued. The clear import of her testimony was that Boeing issued the contract based on the overall cost of Skookum's winning bid, which she described as providing "best value" for Boeing, and not on any subcontractor's identity. This is consistent with the nature of a bundled services agreement, where the bidder can provide services itself or engage subcontractors.

Michele Zoda was a senior Boeing procurement agent when the contract to Skookum was issued, providing guidance to Ms. Maguire. She confirmed at trial that Boeing decided on the basis of the overall economics of Skookum's proposal; that Boeing generally does not insert itself into the selection of subcontractors by the bundled services provider; and that revisions to a subcontractor's proposal can continue late into the bidding process. As discussed below, this last fact is significant because Sauers was permitted to amend its pricing and scope of services well into the negotiation process with Boeing, an opportunity Skookum denied to Cenova.

Skookum next argues that the agreement applied only to Cenova's original proposal, and that when it became clear Boeing would require a lower bid number, Skookum's commitment to Cenova ended. This argument fails for three reasons. First, the fact that Skookum explicitly promised to use Cenova if it was awarded the contract with Boeing is flatly inconsistent with the proposition that its commitment was limited to Cenova's initial proposal. Second, Skookum understood its ongoing obligation to Cenova. This was evidenced by the communication from Skookum's principal negotiator, Martin Ranalli, to Sauers, at an advanced stage in the bidding process, when he revealed that Skookum had an MOU with Cenova, stating, "while I have not been able to divorce them completely just know that process is in the works." P-46. In that same email, he stated, "we are not completely free and in the clear, (i.e. the risk of no litigation is not 100%)." *Id.*

Third, under Pennsylvania law, there is a duty of good faith and fair dealing implied in every contract. *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (en banc) ("Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.") (quoting Restatement (Second) of Contracts, § 205)). When Boeing advised that cost savings would be a prime consideration in awarding the bundled services contract, and suggested competitive bids from participating subcontractors, Skookum reassured Cenova it did not intend to go into the marketplace. P-12. When Boeing then referred Sauers to Skookum after Sauers marketed its services to Boeing, within the span of only a few days, Skookum quickly embraced Sauers, secured a rush bid without a site visit, and submitted the bid as part of its proposal to Boeing. To facilitate Sauers's efforts, Skookum provided it with information Cenova possessed based upon its long tenure at the Ridley Park site. Skookum did this despite a clause in the MOU providing that "[a]ll pricing and information provided by

6

Cenova is deemed proprietary and confidential." Notice of Removal, Ex. E, ECF 1-5 at 10. Skookum attempts to argue that the information it shared was not "proprietary," but the MOU's confidentiality provision broadly extends to "information" as well. Clearly, Skookum's sharing this information allowed Sauers to submit a bid on short notice without a site visit. Sauers included verbatim language from Cenova's proposal that was informed by Cenova's prior service to Boeing.[3] At trial, Sauers's then-owner, Joseph Sauers, testified that the language in question was part of its standard proposal. I specifically reject this testimony, as the witness hesitated, and appeared uncomfortable with his answer.

With no notice to Cenova, Skookum submitted a bid with Sauers's numbers. It then advised Cenova that to be competitive, it submitted a "floor and cap" pricing proposal – the model Sauers's bid advocated – with a base price of $420,000 and a per inch rate of $20,000 tied to various levels of snow accumulation. P-58. When Cenova expressed its surprise, based on its experience at the site and specifically the expectation of various Boeing supervisors as to the level of service, Skookum for the first time revealed its discussions with Sauers. Even then, Skookum was less than candid about how that connection developed, with Mr. Ranalli stating that he contacted Sauers "out of curiosity," *id.*, when in fact, he pursued Sauers seeking to gain favor with Boeing.

Unsurprisingly, Cenova asked for details of Sauers's proposal, but after checking with Sauers, Ranalli declined to provide it, reasoning that Sauers deemed the information confidential. Against this backdrop, Skookum attempts to argue that Cenova's complaint about sharing its

---

[3] *Compare* P-14, April 14, 2020 Cenova's Proposal ("*Cenova* will proceed on post storm cleanup approximately 2-3 hours after the conclusion of event.") (emphasis added), *with* D-14, June 12, 2020 Sauers's Proposal ("*Subcontractor* will proceed on post-storm cleanup approximately 2-3 hours after the conclusion of event.") (emphasis added); *see* P-21 (Skookum sending verbatim language taken from Cenova's proposal to Sauers on June 9, 2020).

proprietary information should be discounted because Cenova itself sought a rival's data. I disagree. Based on the MOU's plain language, Cenova was entitled to assume that Skookum was working cooperatively with it in an alliance to secure the Boeing bundled services contract. It was therefore to be expected that Cenova would seek information from Skookum, particularly when the numbers cited did not square with its experience servicing Boeing for many years. Further, Cenova had a confidentiality agreement with Skookum, and Sauers did not. It is no small irony that Skookum proved more solicitous of Sauers than of the party with which it had signed an agreement.

When Skookum submitted its first bid without Cenova, it was no longer actively working with Cenova to secure the contract. It did not, however, entirely abandon Cenova at that point, whether it was because of the MOU, or, as seems more likely, out of concern that Sauers might not be acceptable to Boeing given Cenova's tenure and record of past service at the site. Instead, Skookum invited Cenova to submit revised bids. Cenova did so, but throughout the process, continued to communicate its concern about the ability to adequately service the Boeing site at the levels that Sauers suggested. As one example, there were landing pads for helicopters which required prompt, specialized attention. And these concerns proved prescient. As discussed below, in the final stages of negotiation between Skookum and Boeing, negotiations from which Cenova was excluded by Skookum, various additional charges in the initial Sauers proposal began to mount, narrowing the gap between Sauers and Cenova. What is noteworthy over the period from June through early September 2020, when the bid process was ongoing, was the substantial communication from Skookum to Sauers as contrasted with the relatively minimal communication from Skookum to Cenova. In practical terms, Skookum was facilitating Sauers's chance to be the snow removal contractor, to Cenova's detriment. As one illustration,

in his email advising Sauers of his intent to seek a "divorce" from Cenova, P-46, Mr. Ranalli invoked Cenova's experience at the site as something important to incorporate into Sauers's bid:

> One key piece of the puzzle that I am waiting on is that Cenova had pointed out that the statement of work does not necessarily cover all of the Boeing expectations (or at least what they, Cenova, has experienced over the last seven years.) Honestly, this is my fault for not engaging with them sooner and asking this question and getting is [sic] sorted out during the negotiation phase with Boeing. But given where we are today, I want to be sure we Skookum and/or Sauers is covered and we don't experience a very difficult winter of learning Boeing's expectations the hard way.

There were also multiple overtures from Mr. Ranalli to Boeing seeking its approval to replace Cenova with Sauers. *See, e.g.*, P-78, Aug. 21, 2020 Email ("I am more worried about having to 'deal' with Cenova and any other Boeing folks who are expecting Cenova. Having a final decision on who to go with from Boeing, only strengthens my ability to cut loose from Cenova."); P-80, Aug. 25, 2020 Email ("I sent over a few time slots that Sauers is free later this week. I wanted to confirm that I am clear to let Cenova, the incumbent, know that they are not the selected provider."). There is no way to reconcile Skookum's efforts to foster Sauers's success with its duty of good faith and fair dealing to Cenova.

At trial, Mr. Ranalli testified to offensive and harassing communications from Cenova. I can discern nothing fitting that description in the voluminous correspondence reviewed at trial. Cenova's President, Harry Scott, presented as a blunt-spoken individual with firm views of what constitutes quality snow removal. I would expect him to be assertive in business dealings and would further expect that the tone of conversations likely became more pointed as Cenova realized it was being left behind. But there is no conduct rising to a level that might entitle Skookum to assert a breach and renounce a contract. Furthermore, when this testimony is considered in conjunction with Mr. Ranalli's many overtures to Boeing seeking approval of

Sauers, it suggests that it became Ranalli's personal preference to work with Sauers, a result he then undertook to achieve notwithstanding the MOU.

Skookum also argues that Cenova's initial proposal was simply too high, and that Skookum was relieved of any commitment under the MOU when the bid it submitted to Boeing was for a number below what Cenova quoted. But this defense also fails. First, as previously discussed, Skookum's own conduct showed a recognition of continued obligations to Cenova. And Skookum effectively isolated Cenova during the later stages of the negotiation process with Boeing. As Cenova predicted, Boeing realized that Sauers's baseline bid became less attractive as charges were added to provide the level of service Boeing expected. In an email to Mr. Ranalli, Boeing specifically suggested going back to Cenova for more detail. P-79. Mr. Ranalli summarily dismissed that, contending that exclusions in the Cenova proposal made it uncompetitive. P-81. He provided no analysis to Boeing, and as someone with no meaningful background in snow removal, it is unclear how he would be qualified to assess those exclusions and compare them to Sauers's bid. At trial, he offered the same conclusory assessment, but again with no explanation. Recognizing the potential importance of this issue, I paid close attention to the witness's demeanor, and he rushed through his answer, and seemed to lack conviction in his testimony.

And Skookum's refusal to allow Cenova to compete is highly material. At trial, Cenova's chief operating officer, David Magill, offered an analysis of the supplemental invoices Sauers submitted during its performance of the contract, and in fact, there were substantial charges to Boeing necessitated by limitations in the scope of Sauers's proposal. Cenova would therefore have been able to make valid points to Boeing about the illusory nature of cost savings in the Sauers proposal had it been allowed to do so.

In the last stages of the negotiation process, Boeing's representatives were in direct communication with Skookum and Sauers, adjusting specific items in the snow removal proposal to increase the chances of the overall bid package being accepted by Boeing's leadership team. *See* P-83 (Boeing inviting Skookum and Sauers representatives to an August 28, 2020 virtual meeting "to discuss scope clarifications and questions around the Snow and Ice Removal services for the Philadelphia site."); P-86 (Skookum emailing Boeing options for additional services and costs not included in Sauers's proposal after virtual meeting); P-87 (excel spreadsheet reflecting Boeing's notes from virtual meeting regarding changes to proposed scope of work and pricing structure). This underscores the fact that the bid process was fluid, as testified to by Ms. Zoda of Boeing, and that Cenova was materially prejudiced by being frozen out of the process. If Skookum gave Cenova a final opportunity to accept the number Boeing deemed reasonable for snow removal services, or even if it allowed Cenova to meaningfully participate in the late stages of the bid process, it might be able to argue that it met its obligations under the MOU. But on the record before me it cannot, particularly when the MOU contained an explicit commitment that Skookum would not serve as the bundled services contractor to Boeing without Cenova's participation.

### C.  Plaintiff Cenova has Proven Damages

Skookum did not contest damages at trial. I am persuaded that the analysis performed by Mr. Magill of Cenova constitutes a fair and reasonable assessment of Cenova's lost profits. Mr. Magill took the bills Boeing paid to Skookum during the relevant years and assumed that Cenova would have presented substantially similar invoices. He then applied Cenova's historic rate of gross profit – 45 percent – and reduced that by an additional 5 percent to account for overhead costs, resulting in a net profit of 40 percent. When that rate is applied to the gross billings, it yields $1,444,340.50. *See* P-102.

Cenova claims two other items of damages. First, it claims reimbursement of specialty products used at the Ridley Park site to service helipads in the amount of $3,210, because it was unable to use them at any other site. I credit this testimony and will include that amount in the award. It also claims $14,500 in costs related to demobilizing the site and removing its equipment. I do not challenge the amount claimed but cannot simply assume that Cenova would be the snow removal contractor in perpetuity. At some point, it would likely have incurred equipment removal costs regardless of Skookum's breach, which weighs against an award of damages for such expense. I will therefore exclude those $14,500 in costs from the award.

**D. Conclusion**

The bundled services contract at Boeing was a valuable opportunity for Skookum which it pursued with determination. When the RFP designated Cenova as the preferred snow removal contractor, Skookum did not hesitate to enter into the MOU, even when Cenova insisted on what reads almost as a guaranty that Cenova would be included in any Skookum bid package. When Boeing later suggested a bid from Sauers, Skookum moved with equal dispatch, forming a relationship with Sauers within the span of only four days, and from that point forward, most of its efforts seemed designed to cement the relationship with Sauers. Skookum clearly understood that the MOU constrained its options but decided that proceeding with the Boeing contract without Cenova was a risk worth taking. It was not.[4]

---

[4] Defense counsel artfully worked into his narrative the fact that Skookum is a non-profit entity that facilitates employment of people with disabilities. That work is praiseworthy, but the law of contracts applies with equal force to non-profit entities.

Judgment will be entered in Cenova's favor in the total amount of $1,458,840. Consistent with these findings and conclusions, Cenova will be granted leave to submit a calculation of pre-judgment interest.

/s/ Gerald Austin McHugh
United States District Judge
